Morning is in re Joseph P. 410-0346. In re Joseph P. For the appellant, Ms. Gracie, and for the appellee, Mr. Manchin, you may proceed. Good morning. May it please the court and counsel. This is a County case based on a commitment order and a medications order, two separate cases that have been consolidated on appeal. On appeal, he alleges that there were procedural violations, prejudicial procedural violations that impacted him.  It was presented that the orders were substantively wrong. He hopes that this court will consider his procedural violations under the public interest exception to mootness and that this court will consider his substantive arguments based on collateral consequences, exception to mootness, because he's never been committed before, as far as we know, and he has never been charged with a felony. As to the procedural violations, this is an article six case. It was filed as an emergency involuntary admission petition by his mother. If we look at the time frame, just based on the face of the record, it appears that he and his mother were involved in an argument in the early, well sometime in the either late night of August, or excuse me, April 14th, or the early morning of April 15th. And the police were involved, and he was then transported to the hospital in Quincy where he lived with his mother. And according to the petition, he was admitted there April 15th at 2.40 AM. There's two indications that at that time he was admitted to Blessing Hospital. They were familiar with him there. He had been there on another occasion, presumably for a voluntary commitment because it was very short. At least there's no indication he was committed by a court to stay there. And then at 3 AM, the nurse indicates that she gave him a copy of the petition, supposedly the petition that was filed. And that petition was signed by his mother, but not until 6.30 PM later that night. So he was detained at Blessing Hospital at least from 2.40 AM, maybe a little bit before that, until 6.30 PM. So we don't know if he was given an unsigned petition. Well, he must have been. And then all this time he's at the hospital and no doctor has examined. Well, we don't know if he was being evaluated. We don't know if he was being treated for sure. But at any rate, no one certified him for involuntary admission until 8 PM, and that was in Blessing Hospital emergency room. So we don't know for sure if he was detained in the ER or if he had been on their mental health floor. But at any rate, after that, then he was transported to McFarland where he was again examined by a doctor. And so by now he's at McFarland. He's 18 years old. He's never lived away from home. He's, I don't know, he's never been at McFarland or any other facility that we know of. And so the whole business day of April 15th went by. Does the record contain any definitive information as to whether he's been previously committed anywhere? It just says he had several hospitalizations at Blessing and that in late 2009 he was there for 30 days. It doesn't say that he was ever committed there. So for purposes of collateral consequences, you believe circumstances are different, whether or not someone has voluntarily committed themselves as opposed to an involuntary commitment? I think so. Has any court yet said that? I read Alfred H.H. and the other cases as requiring a court commitment. I don't know. That's just how I've read them. And I think Suzette D is along those lines. And I think that would be aligned with the cases that discuss benefits of treatment that encourage voluntary treatment and encourage people. The Supreme Court, as I recall, and Alfred H.H. seem to speak about collateral consequences resulting if someone gets an involuntary commitment, this is something that could possibly have effect for later assessments or determinations. Is that what they said? Yes. And I don't think there's any question. And as I read this court's rulings and as I read, as I interpret that, the Supreme Court's ruling in that case, I think if there's a court-ordered involuntary commitment, I don't think there's any question that it has impact on future appeals for sure, especially if there's only an argument made on the substance. You're familiar with this record more than I. Is there some indication here that the people actively involved, for lack of a better way of putting it, seemed to have a handle on what they were doing, why and how they were doing it, and what they were required to do? I doubt that. My own theory about this that may not be necessary. I'd be happy to hear it. He had a history of Asperger's and he was 18 years old living with his mother. I think he kept late hours. I think he had left high school. He, for his own reasons, they built it into schizophrenia. Well, Ms. Tracy, this sounds like the typical case where everyone says, hey, we got a crazy person here. And maybe they do. My concern is compliance with what the legislature says you're supposed to be doing with these crazy people. And that's mine. And I think when he got to the hospital, I think they were confused between his Asperger's and what they thought could be a mental illness. Because when they got to court, they struck the dangerousness allegation that had been there before. But I think also the petition that the mom signed at 6.30 PM was defective on its face because in court then, they added her as a witness and as a family member. There had been no. So the petition would have been defective on those grounds as well. But besides what I've already said, but I think that if you're going to do an emergency admission, I think it's very clear. The time frames are very simple, very clear. As far as filing the petition, I think since this court's ruling in DeMere and George O, I think, which wasn't here, but I think those two cases together, the time frames are very specific. Let me ask for your expertise on this subject. Since you're from the Guardianship and Advocacy Commission in Peoria, you must have occasion to look at these kinds of cases, not statewide, at least outside of the Cook County area. Would that be correct? Yes. It seems like there are a few volume dealers, so to speak, in these kinds of cases. Salmon County is one. To some lesser extent, maybe Adams County, Champaign County, Glane County. We get a lot of Salmon County cases. In the third district, does Peoria County get a lot of these? Not so much anymore. Is it Salmon County that seems to get the most? From what crosses my desk, yes. And I think things were better for a while. I think... But less so now? Well, I think there's a new wave of procedural problems. I think numbers have been down. I think through your efforts, I think through a lot of discussions at the trial court level, and I think things were just better for a while. And now... Well, in a special concurrence I wrote a couple years ago, I don't remember, Dorothy Jayen called it, we got to get a flow chart so people know what they're supposed to do. And I was pleased to see the Supreme Court cited my special concurrence approvingly earlier this year. Has that ever happened? I think in other counties it does, for sure. I... Other counties that I've dealt with. Which are those? Well, I mostly do trial work in Lee County, and I know there they do it. So Lee County can figure this out? They have a flow chart that works? What you're supposed to do and when? For the most part. And then the things that didn't work out, I don't know, we tried to take care of it in the trial court, which is... Well, that's where it should be taken care of. I know, and I totally agree that it should be, but it doesn't always happen there. And I think in this case it totally didn't happen there. But aren't the problems in this case pre-petition? I mean, in other words, the police officers didn't sign the emergency petition, the mother signed them late. The police didn't even have to sign the petition. Well, but the police officer didn't identify himself. That's a deficiency. Well, or if he really believed that he wasn't involved, all he had to say was no. You know, after DeMere, the legislature changed 606, so that, because they said the problem was the police officers were too busy. They didn't have time to transport these people and fill out petitions, and so the legislature said, okay, then just give your badge number and give your ID, or just do not involve saying no. Which they didn't do in this case. No, no. Can I ask you a question? How many counties is the McFarland Zone Center serving now? I don't even know, but... I would guess, I know from Peoria south to wherever, like Alton and... So dozens at least. Oh, the whole middle section of the state. And that's because there's no mental health facilities comparable to McFarland. They've all been shut down, basically. Well, Singer's still in Rockford. Where's that, Rockford? Okay, that's Rockford North. And some cases from the private hospital in Peoria go to Rockford, but some of them get shifted to Broman, and if they get shifted to Broman, then some of them have ended up at McFarland, but so Peoria's kind of on the fringe of both. Did I hear you say that the numbers were down to 650 at one time? 650 filings a year? Oh, no, I don't... I know this year so far, I think it's over 800. Well, I think anecdotally, it was reported, that last oral argument on one of these mental health cases, which was just a week or so ago. But Sangamon County probably will have a thousand petitions this year. One would assume that most of those cases don't originate in Sangamon County. They are because people are transported here. But nonetheless, the prosecutor here, the appointed counsel or public defenders here, and the judge here are the ones that handle the cases. It's also reported, I think just anecdotally, that one judge is handling most of this, if not all of it. It's also noted that that judge is an associate judge, which might suggest something about the pecking order in the Sangamon County Courthouse, which I don't know that you could speak to. Does that all seem to be accurate from your perspective? Possibly a thousand cases, but at least more than you said already were at 800. So it's going to be more. And the burden falls on Sangamon County because, as Justice Polk has indicated, McFarland happens to be here. So the flowchart, getting it taken care of in the trial court, no apologies to Lee County, it's probably more important that the flowchart work here in Sangamon County than it is anywhere else. Because that's where all the cases are. Would that be right? I would say so. What is it that we could do to get their attention? Well, I guess to recognize the problems. Well, we recognize the procedural defects. Sometimes we, well, that was waived. That's our favorite doctrine of any court of review. No, we are the intermediate court of affirmances and waivers, as it's been described. Every once in a while, we chastise. Every once in a while, we do something particularly substantive, like Justice Steigman's checklist or flowchart. Actually, I didn't write it. I called for it. Maybe that was my problem. Well, yes, it was suggested. But many of us are reminded of the small note cards that prosecutors used to have in traffic cases, where they knew that if they asked this series of questions and remembered to establish venue, if the judge believed the police officer, then they were going to get a conviction on a traffic ticket. And it would appear as if, no matter who the assistant state's attorney is, and I assume it's a revolving door based on experience, they are unwilling or unable to understand that a petition is a pleading, so it ought to be filled out, no blanks. Or if there's a blank, say, I know I'm leaving this blank. I'm leaving it blank because there's nothing to fill in here because we don't have any information about the respondent's family because he won't disclose it. And his mother lives in Costa Rica, which was our case from a week or so ago, rather than just leaving it blank. And that there are certain questions that ought to be asked. What do we do? Short of just, these are irregularities in reverse, or these are irregularities in, but unfortunately, they've been forfeited and affirmed. Either way, all we're doing is pointing out irregularities or deficiency. Anything more? For you? For us. I don't know. Whenever they ask me, I tell them. I had a call from the attorney, I think in my last case, and he asked me, well, what could I do differently? And I told him. And I don't, so I don't. That was the attorney who represented the respondent in the trial court? Yes. And I understand being overworked, and I understand having all these cases, and they have three venues, and many cases. But I think if they're going to prosecute these cases, it takes like five minutes to go through just, in emergency cases, just to go through and see what you need to do. I mean, if you can't remember it, then I think it's all very clear and simple. And I think, like with him, if they're going to make him go to a facility, I just think they should follow the procedure. Let me ask you a question. Time's up, Ms. Strasey, but I want to ask two questions before you leave us. First, what do they do in Cook County? Do they have a, given their volume, do they have a special court someplace? Cook County is a disaster right now. Oh, so we don't even ask. No, you don't. OK. Second thing is, if we decline to view these matters as, this case is moot, and we were to find procedural regularities in reverse, because there's just too many here, what effect does that have? That wouldn't really change anything other than just to say, hey, don't be doing this no more, this way, no how, never. I mean, what real effect does it have? It's not going to change much for this guy, I guess, he won't stand involuntarily committed for whatever that means. No, he's back home early, actually. But I... So there's no significant damage to Illinois jurisprudence that would result? I think it's time to remind them again. I think if you made an opinion to that effect, I think they have to take notice of it. Well, if it's same in county, we don't even have to make an opinion, they're the ones who get it. Yeah. OK. That's just my... Thank you. Thank you. May it please the court, counsel. I think we're all aware of the problems, and it's not all at the prosecutor's behest, because as your honor noted, that a lot of the problems here arrived at the hospital. So it's not just the prosecutor that should have the checklist, it has to be at every single hospital. And respondent's counsel. And respondent's counsel. And the judge. If they all had the same checklist, it might work better. Yes. But the amazing thing, Mr. Manchin, is that there's really not that much. It's almost like, you know, the hospital, Blessing Hospital, they have a index card to hand to an officer who's bringing crazy people to the hospital and saying, by the way, officer, if you are going to be dropping some crazy person off here, in your judgment, this is what the law requires you to do. Isn't that all that's required? Wouldn't that cover the police officer's role in all of this? That's correct. And the police officer's role is involved only if the defendant is taken into custody. Right. If the defendant or the respondent goes to the hospital voluntarily and the police is just acting as a taxi,  the police officer to give the name. They're only required to give the name and number if the respondent is put in custody. Because there's no objection below to the lack of any police names, we don't know if there's a custodial situation. This is another one of these cases where we're having to speculate as to what happened, why it didn't happen, what, because nobody bothered to object. But the hospital people, and certainly the shrinks involved, everybody else, should understand if someone has now dumped this crazy person on you, the clock has started to run statutorily. And these are the things you got to do. But the clock only runs when they're taken to the mental facility. In this case, all we have is an admission from the record. It looks like all there is is an admission to the emergency department, not to the psychiatric wing at Bussing. The first time he's, based on this record, the first time he's clearly in any kind of mental facility is when he's at McFarland. And the petitions that were filed there and the examinations were timely from the, if you look from the time he's at McFarland, if you look at the time he's at Bussing, the time frame is off. But there's no showing he was in the middle wing at Bussing. Is there a statutory distinction? This court has made the distinction that for the time frame to start running, the individual has to be in the psychiatric wing of the hospital. That just, this court rejected the idea that if you're brought to the hospital and are in the middle, in the emergency wing because of a mental problem, that does not start the timeline. It's only once they're in the middle wing. It, and you're of course, right here though, the flip side of that is, did they really want to keep him in the emergency room for 16 or 17 hours, which would be the opposite of actually admitting him. Isn't it sort of a catch-22 in the sense that you're right, it wasn't objected to below, but the failure of this person who's unable to care for themselves, I mean, that's the state's position, the lawyer who's representing them fails to do his or her job by clarifying, because that's what the objection is going to do. Sometimes this information is available. That failure results in a forfeiture, which the state is able to point to as a forfeiture of the rights of the very person whose rights are being snatched away from them by, in this case, the 18-year-old snatched from his mother's arms and placed in a facility, you know, 80 miles away or however far Quincy is from Springfield, never having lived away from home before. I mean, it's a catch-22 the other way too, because we don't know, we're speculating that there was a violation. Because of the lack of clear information as to when he was in Blessing and where in Blessing he was. So I don't know. These are always the least favorite cases coming to the office because nobody ever seems to get it right. And you're right, it doesn't matter how many opinions this court or the other courts write to say, do it this way or else. So what about the flowchart I called for? Has that ever been prepared? I have never seen one. You know, that's why Matt Jones gets the big bucks. This would be a good thing that can carry back our specific request. Since you guys are really the only statewide organization dealing with prosecutors, and it's not that tricky. Putting it together, and of course it's correct that we need this for judges too, but primarily, and as you know, Mr. Manchin, it's not the favorite in your office with experienced people. I imagine in the state attorney's office and among the court, it is the real scut work stuff. But it is important to the individual that is hospitalized. Yeah, and when all else fails, it's good to follow statutory procedures, especially when we're talking about... That's a good premise. Especially when we're talking about liberty interests. My suggestion is, we're dealing with people who are probably rookie prosecutors, and I don't know that things have changed since my moment in that regard, but there was no training provided for rookie prosecutors. They just kind of watch the previous hearings that some other people did have been the veterans on the job for four weeks, and then they're supposed to figure it out. I suppose what I'm suggesting is a flowchart of when the body comes in, this is what you got to do, and tell the judge this way, check the petition that way, and indeed, aren't there written petitions prepared to be filled out under certain circumstances, and how they're supposed to be done and checked? As I recall, the petitions here are on a chart that has, where you fill in the name here, fill in the name here, fill in the name here, and then there's on the back... The flowchart referring to that petition when this is what you got to do, and check back, and maybe even make a record about what's happening, you know, the crazy stuff. I really think that might be a big help to all concerned. I think it's safe to say, and I infer this from Ms. Tracey's position, it's not as if anyone is intentionally violating the law or wanting to... Trap this guy's rights. You're right. They just... They're a combination of overwork, inexperienced, and probably a bit negligent, which all kind of meshes so that these are the kinds of cases we get. And I think a real help would be as if your office, Mr. Jones in particular, doesn't often get identified from the bench, but... I don't talk to him when I get back to the office. Would be able to sit down and create one of these things and pass it out at the twice annual ISA SAP gatherings. It's not just SAP. It's got to be the public defenders too, because they've got to know the procedures. They're representing the client. Well, and that should... I think Justice Publix is exactly right. Part of preparation... I think the prosecutors are the key part of all this, but there should be something to make sure this is what the defense attorney does and something for the courts as well. Because what happens is there's no objection at the trial court level by the client's attorney. So everybody just keeps going. They've got a high volume and that's basically what's happening. The defender's not overlooking what the petition is containing. But if the petition was done correctly by the prosecutor, there'd be nothing to object to. True. So that's really... I think this is a good point, but this is really something where we really need some guidance. And if Sangamon County is the primary agency, then maybe working with them, they have a new state's attorney now. It's just something that really needs to be done, Mr. Manchin, because... That's a very good point. There is a brand new state's attorney in Sangamon County. Maybe this would be some help in working with them and explain the record shows everyone needs this. And going back to my other question, whether this is... If we'd say, no, this isn't moot, we're going to come up with an address and fine. Then that's going to make any difference anyway. I don't believe it will. I think that's exactly why it's really moot, but the courts are stretching the mootness exceptions to try to address these. Of course, it's because the attitude that whatever you do doesn't really matter because this person is mentally ill and they're going to be out 90 days anyway or 180, whatever. That attitude is the attitude that prevails in the trial court. Not because anybody wants to deprive someone of their rights, but because they're just going through the motions. Let's get this... The psychiatrist is going to testify that this person needs it. We want to help them. The mom is distraught. We're trying to do the right thing. So you listen to some testimony and you decide this kid will be better off at McFarland getting his medication and he'll probably get to go home early, which is what happened once his medication was regimented and he was okay or he adjusted. That's the very attitude that prevails in the trial court. So for us to adopt the same attitude that it won't matter what we say just perpetuates, helps perpetuate the problem and enables the very inefficiencies and irregularities and perhaps we're beyond the point of talking about negligence. We're talking about the stark deprivation of due process for people who are different. People who are alleged to be mentally ill. I think the case was in Ray Dorothy J. N. That's the special concurrence I wrote and I can't remember the name of the case that the Illinois Supreme Court decided. I mean, that's a real man bites dog story when the Supreme Court of Illinois cites approving the public court special concurrence, but they did earlier this year and I forget the name of the case and that might be sufficient incentive to say, well, that may have happened in one more time than they've ever cited just one of our opinions. Yes, there is that. In any event, I don't think anyone is trying to do this. I'm in total agreement with Justice Connett, I suspect we are. This is just a case of people trying to figure out- With the best of intentions. Pardon? With the best of intentions. Yes, but here's the other thing and I've been there and I've talked to the legislature. The disparage of the legislature and what the legislature has done, this is a bad idea, but the answer to that isn't to ignore it. I mean, it's kind of like- To either follow it or get them to amend it. Sure, I mean, we've been through this before with 605B and admonitions and the whole business and gee, could this be done better? Well, possibly. Take your objections to the Supreme Court and see if they might change the rule. But when in doubt, it really is best to follow the law. You're correct, Your Honor. Is there a note? I was going to have her cut some. Are there no specific questions about this case? Apparently not. Okay, thank you, Your Honor. Ms. Tracy? I've got a couple questions before we start, if you don't mind. I thought you said there were three venues for these types of cases? When you stood- Oh, in Sangamon? Are you talking about St. John's Memorial in McFarland? Yes. Okay, gotcha. I wasn't sure what you meant by that. And then, I don't know what the staffing is at your agency, but it's my understanding that mental health cases are only done on Fridays in Sangamon County. Do you have a representative present at those? No, I have come down here to do hearings, but not frequently. What I'm thinking about is somebody in an advisory capacity who would meet with the prosecutor and the defender and try to get things ironed out in the trial court so that we don't have to deal with these appeals. Oh. And that the person there is getting what they need and are entitled to. I would be glad to do that. And I have done it. I don't think I could interfere, necessarily, but when they did approach me and when you, I think from the bench, asked me to call them, I did that. And as an agency- How about your agency calling the new state's attorney in Sangamon County and setting up a meeting and saying, this is what we can do. We're understaffed and overworked too, but we could help, perhaps, by trying to come down on Fridays and working with your people, as well as with the public defender. And maybe you can create this flowchart together with Mr. Manchin's office, you know, the two of you can work together on it, and then I'll bring it with you when you come, because I'll tell you what, when you have a high volume call like that, no matter what the call is, it's like Justice Connett said, if in traffic court you've got your questions laid out, you can ask them, one, two, three, and you're done. If you two could work together and provide a form, they're going to accept it willingly, I would think. Otherwise, they're crazy. Let's put it that way. I think the judge would certainly welcome all of this too. I'm sure a judge who, if we're told that he's handling all, he would welcome help. Well, and I can say from my own experience, well, you can see from these records, when the violations are brought to his attention, then they're cured. And I just know he addresses them when they're brought before him. But I totally agree with you that it's not only the prosecutor's responsibility. As defense counsel, I think you share in- Are these typically the public defender's office who's handling these cases, the Sangamon County PD? Pardon me? Is it the Sangamon County public defender's office? Yes. See, so I think you need to meet with both the state's attorney and the public defender. And they probably do that by agreement. Right. Because the public defender probably isn't statutorily required to represent people in mental health cases. I would imagine that varies from county to county, and it depends on the relationship of the prosecutor, the court, and the public defender. There's a new public defender who also, Mr. Atwell's now left on his work for the bench, and he would probably, or whoever the new public defender is, might very well welcome some, yeah, I got these rookies doing this stuff. You got something that would help them? No, I think that's it. I will also report, just as a glimmer of sunlight on the horizon, McLean County will be establishing a mental health court. And it has a prosecutor, an older prosecutor who went to school specifically because they wanted to do this kind of work and was committed to being in that courtroom, so they're not likely to get transferred out after six months of showing proficiency. So maybe that will help, at least in that county. Thank you. We'll take this matter under advisement.